501 S.E.2d 296 (1998)
232 Ga. App. 134
In the Interest of C.L.R., a child.
No. A98A0083.
Court of Appeals of Georgia.
April 9, 1998.
*297 Cassandra M. Ford, for appellant.
Thurbert E. Baker, Attorney General, Philip B. Spivey, Shalen A. Sgrosso, Assistant Attorneys General, Jon P. Carr, for appellee.
RUFFIN, Judge.
Appellant, the mother of C.L.R., appeals from the juvenile court's orders terminating her parental rights to C.L.R. and placing her with her foster mother for adoption. The mother argues on appeal that there was insufficient evidence to support the termination order and that the juvenile court erred in not placing C.L.R. with the child's paternal grandmother. For reasons which follow, we affirm.
1. "The standard of review on appeal from a termination of parental rights is whether, after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated. [Cit.] On appeal, `this Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met.' [Cit.]" In the Interest of R.D.S.P., 230 Ga.App. 205, 495 S.E.2d 867 (1998).
"`OCGA § 15-11-81(a) provides a two-step procedure to be followed in considering the termination of parental rights. First, the court shall determine whether there is present clear and convincing evidence of parental misconduct or inability as provided by OCGA § 15-11-81(b). Secondly, if there is clear and convincing evidence of such parental misconduct or inability, the court shall then consider whether termination of parental rights is in the best interest of the child.' [Cit.]" In the Interest of K.J., 226 Ga.App. 303, 486 S.E.2d 899 (1997). "Parental misconduct or inability is found where (1) the child is deprived, (2) the lack of proper parental care or control by the parent in question is the cause of the child's deprivation, (3) the cause of deprivation is likely to continue or will not likely be remedied, and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-81(b)(4)(A)." *298 In the Interest of J.B.A., 230 Ga.App. 181, 182, 495 S.E.2d 636 (1998).
In this case, the evidence shows that C.L.R.'s mother has a long history of criminal arrests and incarceration, both prior to and after C.L.R.'s birth on April 25, 1994. In November 1990, the mother pleaded guilty to violating the Georgia Controlled Substances Act and was sentenced to seven years, two years to serve and the remainder on probation. She was later incarcerated from October 1991 until December 1991 for violating parole. The mother was jailed again in March 1992 for another parole violation. The mother was arrested on criminal trespass charges on December 1, 1992 and again on November 9, 1993. In late December 1993, she was arrested on charges of fighting words and criminal trespass. Approximately six weeks before giving birth to C.L.R., the mother was arrested for felony shoplifting.
C.L.R. was placed in foster care on July 13, 1994. In August 1994, the mother was arrested and incarcerated for a parole violation and a forgery charge. In October 1994 the mother pleaded guilty to the forgery charge, and her probation on the 1990 drug conviction was revoked. She was sentenced to five years on the forgery conviction to run concurrent with the five remaining years on the drug conviction. Her release date is set for August 1999, at which time C.L.R. will be five years old.
During the mother's incarceration prior to the termination hearing, she became violent. She admitted at the termination hearing that she has been disciplined four times during her current incarceration for fighting with officers and using obscene words. For example, on September 27, 1994, she attempted to strike detention officers of the Baldwin County Sheriff's Office. She was charged with obstruction of an officer. Additionally, on October 4, 1994, she began yelling and screaming in her cell. She resisted and attempted to strike officers with a glass coffee carafe as they were escorting her to another location. Because she was a "problem inmate," she was moved to the Putnam County Sheriff's Office for a period of time.
In addition to the criminal conduct and incarceration, there is evidence that the mother has a history of drug abuse. Prior to C.L.R.'s birth, the mother's parental rights in two other children were terminated, in part because of her addiction to and abuse of crack cocaine and alcohol. The mother admitted that she used crack cocaine during her pregnancy with C.L.R. C.L.R. exhibited physical signs, including tense muscles and developmental delays, that indicated her mother had used drugs during pregnancy which had affected C.L.R.
Other evidence produced at the termination hearing shows that C.L.R.'s mother is incapable and/or unwilling to care for her children. The mother's two older children, T.D.R., born November 1, 1986, and S.A.R., born February 7, 1988, were found to be deprived and removed from her care because of her history of domestic violence, fighting in the community, and drug and alcohol abuse. Despite assistance by the Department of Family & Children Services ("DFCS"), the mother could not keep food in her home for T.D.R. and S.A.R. Her rights in T.D.R. and S.A.R. were terminated in August 1990 because she failed to abide by the court-ordered reunification plans, to maintain a stable home environment, to stop using drugs, to complete drug rehabilitation treatment, and to visit her children regularly.
With respect to C.L.R., the evidence revealed that the mother did bring the child in to the Baldwin County Health Department on June 6, 1994, for a physical. Due to C.L.R.'s condition, including tremors, muscle stiffness and developmental delays, C.L.R. was scheduled to return for a checkup on June 30, 1994. However, the mother did not show at the appointed time, but arrived with C.L.R. in the late afternoon as the health department was closing. The mother was insistent that she had to leave immediately. The mother promised to return with C.L.R. at a later date for C.L.R. to receive necessary immunizations. However, the mother did not abide by her promise to return.
Between the time C.L.R. was placed in foster care on July 13, 1994 and the mother's incarceration in August 1994, the mother was scheduled to have four visits with C.L.R.
*299 She failed to appear at two of these four visits. During her incarceration, the mother at first did not want to visit with C.L.R. because she was incarcerated. C.L.R. has had approximately seven visits with her mother in prison up to the time of the termination hearing.
The mother's reunification plan was continued while she was incarcerated. Under the plan, she was required to complete parenting classes and maintain a bond with C.L.R. According to the mother's DFCS caseworker, prior to the filing of the termination petition, the mother had not completed the parenting classes. The caseworker said that bonding, through C.L.R.'s visits with her mother in prison, had been difficult to establish, in part because of the mother's poor behavior in prison which has caused her to be disciplined and the visits canceled. The caseworker noted that C.L.R.'s mother was to be released from prison after eighteen months incarceration, but due to the mother's problems with her behavior with peers as well as staff, she had to serve a full five years. Accordingly, this has delayed completion of the reunification plan.
(a) There is clear and convincing evidence that C.L.R. is deprived. OCGA § 15-11-81(b)(4)(A)(i). A child is deprived if she "[i]s without proper parental care or control... or other care or control necessary for [her] physical, mental, or emotional health or morals." OCGA § 15-11-2(8)(A). Here, C.L.R. was taken from her mother's custody in July 1994 and adjudicated deprived in a September 19, 1994 order. There is no evidence that this order was appealed. Therefore, the mother is bound by the finding of deprivation and the first factor is met. See In the Interest of E.C., 225 Ga.App. 12, 14-15, 482 S.E.2d 522 (1997).
Moreover, the evidence is clear and convincing that C.L.R. was deprived in 1994 due to the lack of proper parental care and control. OCGA § 15-11-81(b)(4)(A)(ii); OCGA § 15-11-2(8)(A). Among the factors to be considered in determining whether the child is without "proper parental care or control" is the parent's "[e]xcessive use of or history of chronic unrehabilitated abuse of intoxicating liquors or narcotic or dangerous drugs" that has rendered the parent incapable of adequately providing for the child. OCGA § 15-11-81(b)(4)(B)(ii). Here, the mother's chronic drug and alcohol use seriously impaired her ability to take care of her other two children, resulting in the termination of her rights in those children. Her drug use also harmed C.L.R., as the child's growth and development was hindered by the mother's admitted use of crack cocaine during her pregnancy with C.L.R.
The lack of proper parental care or control is also revealed through the mother's convictions and incarceration which has had and will continue to have a "demonstrable negative effect on the quality of the parent-child relationship." OCGA § 15-11-81(b)(4)(B)(iii). The mother has been incarcerated since C.L.R. was approximately four months old and will not be released until C.L.R. is five years old. This imprisonment not only negatively impacts the mother's relationship with her child, but has prevented the establishment of any meaningful parent-child relationship. The mother only saw C.L.R. seven times from August 1994 to May 17, 1997, the date of the termination hearing. According to the DFCS caseworker, C.L.R. did not enjoy those visits with her mother. C.L.R. would not let the DFCS caseworker leave the room, and on several visits would not allow her mother to touch her. On several visits, C.L.R. would begin crying when she and the caseworker arrived at the prison. According to C.L.R.'s foster mother, C.L.R. had nightmares after her visits with her mother. In the caseworker's opinion, C.L.R. does not recognize the mother as her mother.
The mother's neglect and egregious conduct towards C.L.R. and the mother's two other children is additional evidence of the lack of proper parental care or control. OCGA § 15-11-81(b)(4)(B)(iv) and (v). The mother's drug and alcohol abuse, her propensity towards violence and criminal conduct, her inability to provide food for her other two children, and her unwillingness to meet case reunification plan goals was so egregious and detrimental to the other children's physical, mental and emotional health that she lost her parental rights in these children. Moreover, the mother's use of crack cocaine *300 up through the last week of her pregnancy with C.L.R. is clear evidence of the mother's "alarming lack of concern for the safety and well-being of her [child]." In the Interest of T.B.R., 224 Ga.App. 470, 474(1)(c), 480 S.E.2d 901 (1997). After C.L.R.'s birth, the mother showed little interest in taking care of C.L.R., given that she failed to bring the child to the health department for scheduled immunizations and checkups. All this evidence reveals the mother's unwillingness or inability to care for her child to the child's physical, mental and emotional detriment. See OCGA § 15-11-81(b)(4)(B); OCGA § 15-11-2(8)(A).
(b) The mother's incarceration, her drug habit, her crack cocaine use during C.L.R.'s pregnancy, and her neglectful attitude towards caring for C.L.R., without doubt, is the cause of C.L.R.'s deprivation. OCGA § 15-11-81(b)(4)(A)(ii).
(c) C.L.R.'s deprivation is likely to continue if the mother's rights are not terminated, given that her mother will be incarcerated at least until August 1999. See OCGA § 15-11-81(b)(4)(A)(iii). While there is evidence that in the two to three months prior to the termination hearing the mother made progress by attending parenting classes and therapy sessions to cope with her past drug use, violent nature and stress, there is simply no evidence that after August 1999 she will be able to provide adequately for C.L.R. There is no indication that she will be able to obtain stable employment or a stable home environment. Rather, the mother's past experiences with her other children, along with her incarceration, supports the conclusion that the deprivation of C.L.R. will likely continue in the future.
(d) We also find clear and convincing evidence that the continued deprivation is likely to cause serious physical, emotional, mental or moral harm to C.L.R. OCGA § 15-11-81(b)(4)(A)(iv). Until her release in August 1999, she will be totally unable to care for C.L.R. Accordingly, the deprivation will certainly continue until that point. Furthermore, the child's visits with her mother in prison negatively affect the child, as evidenced by the facts that she cries when she arrives at the prison and has nightmares after the visits. It would also cause mental and emotional harm to C.L.R. to remove her from her foster mother, with whom she has bonded, and return her in 1999 to her mother, with whom she has little to no bond.
2. As there is clear and convincing evidence of parental misconduct and inability to care for C.L.R., we next determine whether it is in C.L.R.'s best interest to terminate her mother's rights. OCGA § 15-11-81(a). "The same evidence showing parental misconduct or inability may, and here does, establish this requirement." (Punctuation omitted.) In the Interest of J.B.A., supra at 185, 495 S.E.2d 636. Additionally, the evidence at the termination hearing shows without doubt that C.L.R.'s foster mother, a teacher for 15 years, has provided a secure and stable home for the child, which C.L.R.'s biological mother was unable to provide. The foster mother has assisted in eradicating C.L.R.'s developmental delays. C.L.R. has bonded with the foster mother and calls her mother. There exists no similar bond between C.L.R. and her mother. Currently, C.L.R.'s physical, mental and emotional needs are being met while in the foster mother's care. Accordingly, we conclude that it is clearly in the best interests of the child that the mother's parental rights in C.L.R. be terminated. See In the Interest of J.B.A., supra; In re K.J., supra.
3. We reject the mother's argument that the juvenile court erred in failing to consider placement of C.L.R. with the child's paternal grandmother. OCGA § 15-11-90(a)(1) provides that "[i]f, upon the entering of an order terminating the parental rights of a parent, there is no parent having parental rights, the court shall first attempt to place the child with the child's extended family or with a person related to the child by blood or marriage.... A placement shall be made under the terms of this paragraph only if such a placement is in the best interest of the child." C.L.R.'s father's rights were terminated prior to the termination of the mother's rights. As there was no parent with parental rights, C.L.R. was to be placed with a relative, if it was in the child's best interest.
*301 First, we note that the juvenile court heard evidence regarding the option of placing the child with the paternal grandmother, and referenced this evidence in determining that it was in the best interest of C.L.R. to remain with the foster mother. Therefore, the mother's claim that the juvenile court did not consider relative placement is without merit.
Furthermore, we conclude that the juvenile court did not err in finding that it was in the best interest of the child to be permanently placed with the foster mother. While the paternal grandmother received a favorable evaluation from DFCS and was willing to take custody of C.L.R., she was not even aware that she had a granddaughter until May 1996, when the termination petition was filed. The grandmother had only seen the child five times and C.L.R. had not bonded with her grandmother as she had with her foster mother. The DFCS caseworker concluded that it was in the best interest of C.L.R. that the foster mother, who had provided a stable home for C.L.R. wished to adopt her child, be granted custody. "In light of this evidence, proof that the child would remain in a safe and stable foster home upon termination of the mother's parental rights and evidence of the foster [mother's] intent to adopt the child, we find no abuse of discretion in failing to place the child with a family member ... upon termination of the mother's parental rights. See OCGA § 15-11-90(a)(2)." In the Interest of M.R., 213 Ga.App. 460, 467(3), 444 S.E.2d 866 (1994).
Judgment affirmed.
BEASLEY, J., and HAROLD R. BANKE, Senior Appellate Judge, concur.